UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

WILLIAM W. CROYE
and CHERYL CROYE,

       Plaintiffs,

v.                             Civil Action No. 2:09-00048

GREENPOINT MORTGAGE FUNDING, INC.,
COUNTRYWIDE HOME LOANS SERVICING, LP,
U.S. BANK, NA, and E*TRADE BANK,

       Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

Pending are the motions for summary judgment of defendant GreenPoint Mortgage Funding, Inc. ("GreenPoint") and defendant Countrywide Home Loans Servicing, LP ("Countrywide"), filed March 15, 2010, and March 29, 2010, respectively.  Also pending is GreenPoint's motion to dismiss Count V of the Third Amended Complaint, filed April 29, 2010.[1]

I. Undisputed Facts

Plaintiff William Croye purchased his home at 1815 Orchard Avenue, Belle, West Virginia, for $16,500 in 1971.

---

[1] GreenPoint's partial motion to dismiss Count V, filed April 29, 2010, is timely as to the Third Amended Complaint, which the court allowed by order entered April 12, 2010.

(Pl.'s Resp. 2).  In 2000, Mr. Croye married plaintiff Cheryl Croye and she moved into the home.  (<u>Id.</u>).  In 2003, Mr. Croye became very ill with a life-threatening condition, which prevented him from working for approximately three years.  (<u>Id.</u>).

On May 28, 2004, Ms. Croye obtained two GreenPoint mortgage loans in order to refinance the property.  (<u>Id.</u>; GreenPoint Mot. 3).  GreenPoint served as the lender, and Countrywide has been assigned the servicing rights to the mortgage loans.  (Third Am. Compl. ¶ 3(a)-(b)).  US Bank, NA is the holder of the primary mortgage loan, and E*Trade Bank is the holder of the secondary mortgage loan.  (<u>Id.</u> at ¶ 3(c)-(d)).

The first mortgage secured an Adjustable Rate Note in the amount of $128,000, payable in 360 monthly installments beginning in July 2004 (the "ARM Note").  (GreenPoint Memo. 2). The ARM Note had an initial interest rate of 6.5% and an initial monthly payment of $693.34.[2]  (<u>Id.</u>).

---

[2] A rider accompanying the ARM Note provided that the first reset date for the ARM Note (i.e. the first date on which the interest rate would change) would be five years later on June 1, 2009, and limited the possible interest rate range to a low of 2.75% and a high of 11.5%.  (<u>Id.</u>).  The most recent reset of which the court is aware occurred on December 1, 2009, and reduced the interest rate to 3.375% and the monthly payment to $633.34.  (<u>Id.</u> at 8).

The second mortgage was a "Home Equity Line of Credit Agreement and Promissory Note," in the amount of $24,000, with a draw period of 60 months, a repayment period of 120 months, and a maturity date of June 1, 2019 (the "HELOC Note").  (GreenPoint Mot., Ex. B).  The initial interest rate on the HELOC Note was 4% for the first 3 months of the loan.  (Id.).  The interest rate changed monthly thereafter, but could not exceed a maximum rate of 18%.  (Id. at Ex. B).

In order for Ms. Croye to refinance the property, Mr. Croye, together with Ms. Croye as his spouse, executed a "Quitclaim Deed" to the two of them to place the title of the property in the names of both plaintiffs as joint tenants with the right of survivorship.  (Id. at Ex. F).  Concurrently with the mortgage loans, plaintiffs executed deeds of trust for each of the respective loans, granting GreenPoint a secured interest in the property.  (Id.).  Only Ms. Croye executed the mortgage notes, given Mr. Croye's lack of employment, but both plaintiffs executed the deeds of trust.  (Pl.'s Resp. 4).  Mr. Croye also executed the rider, referred to by him as the Note Rider, which established the terms for adjusting the interest rate of the ARM Note and the lender's rights in the event that the borrowers sell or transfer the property during the life of the ARM Note.  (Pl.'s

3

Resp., Ex. A).  Mr. Croye signed on one of the Note Rider lines
designated for borrower signatures.  (Id.).  Ms. Croye states
that she was unaware at the time that she was the only signatory
on the mortgage notes.  (GreenPoint Mot., Ex. M, C. Croye Dep. at
29:2-5, Feb. 26, 2010).

        The two GreenPoint mortgages essentially paid off two
prior mortgages on the property.  (Id. at Ex. C).  The two prior
mortgages, obtained on or about January 21, 2000, were both held
by Chase Manhattan Mortgage Corporation ("Chase").  (Id.).  The
payoff on the Chase mortgages totaled $154,461.99.  (Id.).
Specifically, the mortgages were in the amounts of $111,430.83
with an interest rate of 8.75% and $43,031.16 with an interest
rate of 9.75%.[3]  (GreenPoint Memo. 8).  GreenPoint calculates the
monthly payments on the two Chase loans at $870.88 and $369.87,
respectively.  (Id. at 8 n.6).

        Prior to GreenPoint issuing the two mortgage loans,
Clara Midkiff of Associated Appraisers prepared an appraisal of
the property, apparently for Dana Capital Group, Inc., that

_____

        [3] According to one of defense counsel in a telephone
conference between counsel for the parties and the court on July
30, 2010, the settlement closing sheet on the new loans
aggregating $152,000.00 shows that Ms. Croye brought $6,000.00 in
cash to the closing, thereby permitting pay off of the Chase
loans aggregating $154,461.99.

indicated its fair market value at the time was $161,000. (Id. at Ex. H at 2). How the Midkiff appraisal came into GreenPoint's hands is not stated. In any event, GreenPoint conducted two reviews of the Midkiff appraisal. First, it conducted an electronic review which provided a risk assessment score based on the Midkiff appraisal. (Id. at Ex. I). The electronic review concluded that Ms. Midkiff's valuation earned a moderate risk score of 650. (Id.). Scores from 600 to 699 are moderate risk scores, meaning that "some elements of the risk of a current overvaluation are present, but do not meet the threshold of high risk."[4] (Id.). If there are additional high-risk elements based on the borrower's credit score or the loan type, moderate risk scores are treated like high risk scores and may require the representative of the lender to lower the loan amount, order a more extensive valuation, or decline the loan. (Id.). If there are low-risk elements in addition to the moderate risk score, no further action is necessary with regard to valuation. (Id.). Second, GreenPoint had another appraiser, Jason J. Schwendeman, provide an independent review of the Midkiff appraisal. (Id. at

---

[4] Scores less than 600 are considered high risk scores and scores above 700 are considered low risk scores. (GreenPoint's Mot., Ex. I).

5

Ex. K).  The independent review found that the Midkiff appraisal provided a reasonable valuation of the property.  (Id.).

Four years later, in 2008, plaintiffs hired Teresa Moore, a real estate appraiser, to perform a retrospective appraisal of the property. (GreenPoint Mot. Ex. D at 1).  On July 15, 2008, Ms. Moore provided plaintiffs with her appraisal which retrospectively valued the property at $98,500 as of March 2004. (Id. at 4).  Defendant Countrywide commissioned an appraisal of plaintiffs' residence on April 15, 2008, which valued the home at $88,000 as of that date.  (Pl.'s Resp. Ex. D at 13).

On June 16, 2004, approximately three weeks after the execution of the two GreenPoint mortgage loans, Mr. Croye filed bankruptcy.  (Pl.'s Resp. 5).  In his 2004 bankruptcy petition, Mr. Croye listed the value of the property as $155,000. (GreenPoint Mot. Ex. O at 3).  Some six years later, and subsequent to the filing of GreenPoint's motion for summary judgment in March 2010, Mr. Croye moved to reopen his bankruptcy case and filed amended Schedules A, B, C, and D listing the value of the property as $88,000.  (Id.).

Plaintiffs separated in 2008 and then divorced.  (Pl.'s Resp. 2).  During the divorce, Ms. Croye moved out and agreed to

6

re-convey her interest in the property to Mr. Croye.[5]  (Id.).
Payments were timely made on the mortgages until approximately
October 2008.  (GreenPoint Mot. Ex. P).


## II.  Procedural History


Plaintiffs filed this action against GreenPoint and
Countrywide on December 11, 2008, in the Circuit Court of Kanawha
County.  Defendants removed on January 15, 2009.  Since the
filing of the complaint, plaintiffs contend that Countrywide has
communicated, both orally and in writing, with the plaintiffs in
an effort to collect on the mortgage loans.  (Third Am. Compl. ¶
22).  Plaintiffs contend that Countrywide directly contacted them
despite knowing that plaintiffs were represented by counsel at
the time.  (Id.).

Plaintiffs allege that the defendants have engaged in
"predatory lending, whereby large national lenders solicit[]
unsophisticated consumers to enter into unwise home loans."
(Third Am. Compl. ¶ 1).  Plaintiffs claim that they were
"successively flipped into higher loans through (1) solicitation,

---

[5] It is unclear whether Ms. Croye re-conveyed her interest
in the property to Mr. Croye.

7

(2) bogus valuation, and (3) refinancing of inflated principal."
(Id. ¶ 2(b)).

On March 13, 2009, Mr. Croye filed a motion to add
Wells Fargo Bank, NA ("Wells Fargo") as a party defendant
inasmuch as he believed Wells Fargo to be the holder of the ARM
Note.  On April 10, 2009, the court granted the motion and added
Wells Fargo as a party defendant.  On March 1, 2010, Mr. Croye
filed a motion to substitute U.S. Bank, NA and E*Trade Bank for
Wells Fargo as party defendants.  On April 9, 2010, the court
granted the motion.

On April 12, 2010, the court granted plaintiffs' motion
to file a third amended complaint.  The third amended complaint
contains five counts: Count I Unconscionability, Count II Fraud,
Count III Illegal Loan, Count IV Illegal Debt Collection, and
Count V Joint Venture, Conspiracy and Agency against all the
defendants.  Of these, Counts I, II, and III are alleged against
GreenPoint, and Count IV is alleged against Countrywide.

Plaintiffs seek the following relief under Count I
Unconscionability, consisting of a declaration that the loans
were induced by unconscionable conduct; a declaration that the
loan agreement is void and unenforceable; and actual damages and

civil penalties of $4,300.  Under Count II Fraud, plaintiffs seek
a declaration that the defendants engaged in a joint venture to
fraudulently misrepresent the market value of the property; an
injunction against enforcement of the contracts; and actual and
punitive damages.  Under Count III Illegal Loan, plaintiffs ask
that the loan and security interest be declared void, and that
the plaintiff be awarded damages pursuant to W. Va. Code § 31-17-
17.  Under Count IV Illegal Debt Collection, plaintiffs seek
civil penalties of $4,400 for each violation and actual damages.
Under Count V Joint Venture, Conspiracy, and Agency, plaintiffs
seek actual and punitive damages.  Under all five Counts,
plaintiffs seek reasonable attorneys fees and costs of litigation
as well as any other relief the court may find equitable and
just.

### III.  Governing Standard

     A party is entitled to summary judgment "if the pleadings,
the discovery and disclosure materials on file, and any
affidavits show that there is no genuine issue as to any material
fact and that the movant is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(c).  Material facts are those necessary

to establish the elements of a party's cause of action.  Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

     A genuine issue of material fact exists if, in viewing
the record and all reasonable inferences drawn therefrom in a
light most favorable to the non-moving party, a reasonable fact-
finder could return a verdict for the non-movant. Id.  The moving
party has the burden of showing -- "that is, pointing out to the
district court -- that there is an absence of evidence to support
the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S.
317, 325 (1986).  If the movant satisfies this burden, then the
non-movant must set forth specific facts as would be admissible
in evidence that demonstrate the existence of a genuine issue of
fact for trial.  Fed. R. Civ. P. 56(c); id. at 322-23.  A party
is entitled to summary judgment if the record as a whole could
not lead a rational trier of fact to find in favor of the non-
movant.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

     Conversely, summary judgment is inappropriate if the
evidence is sufficient for a reasonable fact-finder to return a
verdict in favor of the non-moving party.  Anderson, 477 U.S. at
248.  Even if there is no dispute as to the evidentiary facts,
summary judgment is also not appropriate where the ultimate

factual conclusions to be drawn are in dispute.  <u>Overstreet v. Ky. Cent. Life Ins. Co.</u>, 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, <u>Russell v. Microdyne Corp.</u>, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  <u>Sosebee v. Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

## IV.  Analysis

GreenPoint addressed Counts I, II and III independently in their memorandum in support of summary judgment.  In contrast, plaintiffs chose to address the three counts together in their response brief.  In response to each of GreenPoint's arguments, plaintiffs relied solely on the difference in values between Ms. Midkiff's appraisal and Ms. Moore's retrospective appraisal.

11

Inasmuch as "[a]ll three of the origination claims - Counts I (unconscionable contract), II (fraud) and III (illegal loan in excess of market value) have as their core the excessive loan based upon an inflated appraisal," plaintiffs claim that, "[g]iven the differences in the appraisals, there is little question of the existence of a dispute of fact." (Pl.'s Resp. 7). While there is a question of fact with regard to the fair market value of the property, plaintiffs have not responded to GreenPoint's numerous other legal arguments supporting the granting of summary judgment in GreenPoint's favor.

A.  Count I: Unconscionability - GreenPoint

        In West Virginia, the basic test for unconscionability is:

> [W]hether, in the light of the background and setting
> of the market, the needs of the particular trade or
> case, and the condition of the particular parties to
> the conduct or contract, the conduct involved is, or
> the contract or clauses involved are so one sided as to
> be unconscionable under the circumstances existing at
> the time the conduct occurs or is threatened or at the
> time of the making of the contract.

Arnold v. United Cos. Lending Corp., 511 S.E.2d 854, 860 (W. Va. 1998)(quoting Uniform Consumer Credit Code, § 5.108 comment 3, 7A U.L.A. 170 (1974)).  See also Watkins v. Wells Fargo Home Mortg.,

631 F. Supp. 2d 776, 787 (S.D. W. Va. 2008); <u>Herrod v. First Republic Mortg. Corp., Inc.</u>, 625 S.E.2d 373, 379 (W. Va. 2005). The facts of each case are critical in determining whether a particular conduct or contract is unconscionable.  <u>Herrod</u>, 625 S.E.2d at 379 (citing <u>Arnold</u>, 511 S.E.2d at 869).

In Count I, plaintiffs claim that GreenPoint has "engaged in a pattern of predatory lending practices to make loans to unsophisticated borrowers through a pattern of unconscionable inducement."  (Third Am. Compl. ¶ 9).  In doing so, GreenPoint allegedly "participated in a venture to induce originations based on inflated valuations and placed Plaintiffs in an adjustable loan they would not reasonably pay off."  (<u>Id.</u> at ¶ 10).  As a result, plaintiffs were left "worse off than they were with their existing home financing, and [were put] in jeopardy of losing their home and in a position of inability to sell their home."  Thus, plaintiffs contend that GreenPoint unconscionably induced them to enter into a substantively unfair agreement that should be found unenforceable.  (<u>Id.</u> at ¶ 10).

In support of its motion for summary judgment, GreenPoint has shown that it did not order the appraisal from Ms. Midkiff.  (GreenPoint Mot. Summ. J., Ex. H).  The listed "Lender/Client" on Ms. Midkiff's appraisal is Dana Capital Group,

13

Inc.  (Id.).  While GreenPoint relied on Ms. Midkiff's appraisal
when making the loan, it only did so following an electronic risk
assessment of the value of the property and an independent review
of Ms. Midkiff's appraisal that confirmed Ms. Midkiff's valuation
of the property at $161,000 was reasonable.  (Id., Ex. K).
Additionally, the GreenPoint loan amounts were supported by the
lending history on the property.  As earlier noted, prior to
acquiring the GreenPoint mortgages, plaintiffs had $154,461.99 in
mortgage loans on the property from Chase.

          In response to the evidence provided by GreenPoint,
plaintiffs rely solely upon the two 2008 appraisals reaching far
lower values than Ms. Midkiff's appraisal.  This is simply not
sufficient to establish an unconscionable contract claim under
the circumstances here.  Plaintiffs have not offered any evidence
suggesting that GreenPoint had any arrangement with Ms. Midkiff
to request an inflated value.  There is no evidence that
GreenPoint ever had any contact with Ms. Midkiff whose appraisal
report, as noted, lists Dana Capital Group, Inc. as the
lender/client.  Nor is there any evidence that GreenPoint knew or
should have known that the property was worth less than the value
reached by Ms. Midkiff and subsequently confirmed by Mr.
Schwendeman.  Indeed, the Midkiff appraisal of $161,000 and

GreenPoint's mortgage loans of $152,000 were comfortably in line with the Chase mortgage loans, aggregating some $154,000, that had been on the property for over four years.  In June 2004, Mr. Croye himself listed the value of the property as $155,000 in his bankruptcy petition under penalty of perjury.  Neither have the plaintiffs shown that they are "worse off than they were with their existing home financing."  The plaintiffs have not alleged any reason why their previous mortgage loans would be more beneficial to them than the GreenPoint loans, likely because the new interest rates compare favorably to the Chase rates and the monthly payments were lower.  Further, plaintiffs have failed to establish any inequality in bargaining power in this instance beyond that ordinarily present in a mortgage loan situation.

In sum, plaintiffs have not shown that GreenPoint unconscionably induced plaintiffs into its mortgage loans that replaced even higher mortgage loans.  Accordingly, GreenPoint's motion for summary judgment as to Count I is granted.

B.  Count II: Fraud - GreenPoint

In order to establish a claim for fraud, plaintiffs must prove:

> (1) that the act claimed to be fraudulent was the act
> of the defendant or induced by him; (2) that it was
> material and false; that plaintiff relied upon it and
> was justified under the circumstances in relying upon
> it; and (3) that he was damaged because he relied upon
> it.

Highmark West Virginia, Inc. v. Jamie, 655 S.E.2d 509, 515 (W.

Va. 2007)(quoting Syl. pt. 1, Lengyel v. Lint, 280 S.E.2d 66, 272

(W. Va. 1981)(citations omitted)).  "'Generally, fraud is a

question of fact to be determined by the jury from all the

circumstances of the case,'" but that "'does not automatically

immunize the case from summary judgment.'"  Id. (quoting Jividen

v. Law, Syl. Pt. 1, 461 S.E.2d 451 (W. Va. 1995)).  Plaintiff

must still discharge his "'burden by demonstrating that a

legitimate jury question, i.e. a genuine question of material

fact, is present.'"  Id. (quoting Jividen, Syl. Pt. 1, 461 S.E.2d

451).

        In the complaint, the Count II fraud allegations are as

follows:

> 15.  The Defendant lender intentionally employed and
> relied on inflated valuations of the market value of
> the Plaintiffs' property for the purpose of inducing
> the plaintiffs into contract.
>
> 16.  The reliance on or misrepresentation of the market
> value of the property was intentional and material.
>
> 17.  The Plaintiffs reasonably relied upon the
> procedures being consistent with acceptable lending

practices and the representations of the Defendant when
entering into the loan agreement.

(Third Am. Compl. ¶¶ 15-17).  As a result, plaintiffs allege that
they "were damaged by the Defendant's conduct."  (Id. at ¶ 18).

While evidence presented to the court in support of
plaintiffs' claim of fraud is sparse, the wide variance in the
Midkiff and Moore appraisals raises a question of fact not only
as to the accuracy of the Midkiff appraisal but also whether it
is so far off the mark as to be a material false representation
of the value of the property.  In a fraud claim, if GreenPoint
used a false Midkiff appraisal to induce the plaintiffs to enter
into the loans at issue, "[i]t is not essential that the
defendant know for a fact that the statement or act alleged to be
fraudulent is false."  Lengyel, 280 S.E.2d at 69.  GreenPoint
asserts in its motion for summary judgment and accompanying
memorandum that "the appraisal provided at the time of the
Mortgages was not inflated." (GreenPoint Mot. ¶ 19; GreenPoint
Memo. 8).  GreenPoint does not state to whom the appraisal was
provided other than itself, but the inference may be drawn from
this statement that the Midkiff appraisal was furnished in some
manner to the plaintiffs prior to the closing of the GreenPoint
mortgage loans in order that it be relied upon.  As noted in
Horton, "[i]t is not necessary that the fraudulent

17

representations complained of should be the sole consideration or inducement moving the plaintiff.  If the representations contributed to the formation of the conclusion in the plaintiff's mind, that is enough . . .."  <u>Horton v. Tyree</u>, Syl. Pt. 3, 139 S.E. 737 (W. Va. 1927)(emphasis in original).

In view of genuine issues of material fact that surround the elements of the fraud claim in Count II, GreenPoint's motion for summary judgment on that Count is denied.

C.  Count III: Illegal Loan - GreenPoint

West Virginia Code § 31-17-8(m)(8) prohibits mortgage lenders from securing "a primary or subordinate mortgage loan in a principal amount . . . that exceeds the fair market value of the property."  In order to comply with this provision, lenders may:

> rely upon a bona fide written appraisal of the property made by an independent third-party appraiser, duly licensed or certified by the West Virginia real estate appraiser licensing and certification board and prepared in compliance with the uniform standards of professional appraisal practice.

W. Va. Code § 31-17-8(m)(8).  In Count III, plaintiffs contend that GreenPoint violated this provision by granting plaintiffs a loan that far exceeded the market value of the property.  Once

18

again, the only evidence proffered by plaintiffs in support of
Count III are the two 2008 appraisals, one hindsight and the
other current, that reach lower values than the one performed by
Ms. Midkiff.  However, this is insufficient inasmuch as section
31-17-8(m)(8) authorizes lenders to rely on appraisals when
determining the fair market value so long as the appraisal and
appraiser meet certain requirements.  Here, plaintiffs have not
alleged that Ms. Midkiff's credentials or her appraisal failed to
comply with the statutory requirements.  While the differing
values among the appraisals create a question as to whether the
property was actually worth $161,000 in 2004, they do not
establish GreenPoint's failure to comply with the statute.
Accordingly, GreenPoint's motion for summary judgment is granted
as to Count III.


D.   Count IV: Illegal Debt Collection - Countrywide re Mr. Croye


         The West Virginia Consumer Credit and Protection Act
("WVCCPA") prohibits debt collectors from using unfair or
unconscionable means to collect or attempt to collect any claim.
W. Va. Code § 46A-2-128.  This includes "[a]ny communication with
a consumer whenever it appears that the consumer is represented

19

by an attorney . . . unless the attorney consents to direct communication."  Id. § 46A-2-128(e).

In Count IV, plaintiffs contend that Countrywide has violated this statute by communicating, both orally and in writing, with the plaintiffs in an effort to collect on the mortgage loans notwithstanding plaintiffs' representation by counsel.  Countrywide seeks summary judgment as to plaintiff William Croye's claims in Count IV.  Inasmuch as Mr. Croye did not execute the loans at issue, Countrywide contends that he does not meet the definition of a "consumer" under § 46A-2-122(a) of the WVCCPA wherein the term is defined as "any natural person obligated or allegedly obligated to pay any debt," and, thus, has no standing to bring a claim of illegal debt collection under § 46A-2-128.[6]

---

[6] The WVCCPA contains multiple definitions of "consumer." In § 46A-1-102(12), "consumer" is generally defined as "a natural person who incurs debt pursuant to a consumer credit sale or a consumer loan, or debt or other obligations pursuant to a consumer lease."  In § 46A-2-122(a) "consumer" is defined for purposes of the eight sections that follow, which prohibit certain debt collection activities, as "any natural person obligated or allegedly obligated to pay any debt".  The WVCCPA creates a private right of action for consumers in § 46A-5-101(1) and the parties have treated the applicable definition of consumer for purposes of this action as being the definition found in § 46A-2-122(a).

While it is unlikely that Mr. Croye was ever legally obligated to pay the mortgage loans, plaintiffs have established a question of fact as to whether Mr. Croye was allegedly obligated to pay.  See Arnold v. Palmer, 686 S.E.2d 725, (W. Va. 2009)(holding that a promissory note is not enforceable against a party who signed the deed of trust but did not sign the promissory note inasmuch as promissory notes and deeds of trust are separate legal documents with unique purposes).  Mr. Croye claims that Countrywide telephoned him on more than thirty occasions in an effort to collect on the mortgages.  (Pl.'s Resp. 8).  Countrywide's repeated efforts to collect payment from him suggest the existence of an alleged obligation of Mr. Croye to pay the loans.

Countrywide, contending that Mr. Croye does not fit the statutory definition of a consumer found in § 46A-2-122(a), cites the district judge's holding in McDaniel v. South & Associates, P.C., 325 F. Supp. 2d 1210, 1214 (D. Kan. 2004).  (Countrywide's Reply 2).  There, the court dealt with the similar definition of a consumer found in the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq.  The FDCPA, like the WVCCPA at § 46A-2-122(a), defines "consumer" as "any natural person obligated or allegedly obligated to pay any debt."  15 U.S.C. §

1692a(3).  In <u>McDaniel</u>, two friends of the plaintiff acquired the underlying mortgage loan in order to help the plaintiff acquire the house.  <u>Id.</u>  The two friends obtained a loan to buy the residence, received title to the property, and then sold the home to the plaintiff through a contract for deed.  <u>Id.</u>  The plaintiff made monthly payments to the two friends, who in turn made the monthly mortgage payment.  <u>Id.</u>  Three years later, the two friends refinanced the mortgage and then conveyed the property to the plaintiff via quitclaim deed with the understanding that plaintiff would take over the mortgage payments.  <u>Id.</u>  The plaintiff did not sign any of the closing or loan documents for the initial mortgage or the refinanced mortgage.  <u>Id.</u>  The court in <u>McDaniel</u> found that plaintiff did not have standing to bring an illegal debt collection claim against the debt collector inasmuch as he did not qualify as a consumer because he was not obligated or allegedly obligated to pay any debt.  <u>Id.</u> at 1220-21.  The court noted that plaintiff "never signed any of the closing or loan documents associated with" the note and mortgage.  <u>Id.</u>  It was "further uncontroverted that except for the pleadings in the foreclosure matter, Defendant did not send any correspondence to [Plaintiff], but only sent letters addressed to the [two friends, who executed the mortgage].. . . Defendant never considered [Plaintiff] to be an obligor."  <u>Id.</u>

While the factual scenarios are somewhat similar, it appears there are significant differences between McDaniel and the case at hand.  First, Mr. Croye owned the property at the time the mortgage was executed and he also signed documents associated with the mortgage loans in that he executed the Deeds of Trust as well as the Note Rider.  Second, Countrywide made numerous attempts to contact Mr. Croye despite Ms. Croye being the only signer on the mortgage notes.  In McDaniel, the court noted that the defendant did not consider the plaintiff to be an obligor as evidenced by its lack of correspondence with the plaintiff in order to collect payment.  In contrast, Countrywide treated Mr. Croye as though he was obligated to pay on the loans by contacting him with repeated collection attempts.

The factual setting alleged by Mr. Croye is more nearly similar to that of the plaintiff in Diaz v. D.L. Recovery Corp., 486 F. Supp. 2d 474, 475 (E.D. Pa. 2007).  There, the plaintiff received phone calls demanding payment for outstanding summonses against the father of her children.  Id.  In the calls, the defendants threatened to repossess all of her household belongings and her car if she didn't pay.  Id.  Plaintiff brought an illegal debt collection claim under the FDCPA against the defendants.  Id.  The defendants asserted that the plaintiff did

not have standing to bring an FDCPA claim inasmuch as she did not
qualify as a consumer under its provisions.  Id. at 476.  The
court found that the plaintiff qualified as a consumer inasmuch
as the defendants "demanded money from [her] and even threatened
to take possession of her belongings if she did not pay them."
Id. at 477.  Thus, the court found that the defendants had
maintained that she was obligated to pay the debt, which rendered
her a consumer with standing to bring an illegal debt collection
claim under the FDCPA.  Similarly, Countrywide's calls to Mr.
Croye demanding payment on the debt qualify him as a consumer
"allegedly obligated" to pay on the loan under § 46A-2-122(a).
With regard to Mr. Croye's Count IV claims for illegal debt
collection under the West Virginia statute, Countrywide's motion
for summary judgment is denied.


E.  Count V: Joint Venture, Conspiracy, and Agency


        Plaintiffs have lumped together the individual claims
of joint venture, civil conspiracy, and agency within Count V of
the third amended complaint.  Plaintiffs allege these three
claims in an attempt to place liability for the acts of one
defendant upon all of the defendants.  Inasmuch as the court has
granted GreenPoint's motion for summary judgment as to Counts I

24

and III, Count V may only be used to impose liability upon the defendants for plaintiffs' claims in Counts II and IV.  Both GreenPoint and Countrywide have moved for summary judgment with regard to plaintiffs' claims in Count V for failure to state a claim upon which relief can be granted.

In order to avoid summary judgment as to the claims in Count V, plaintiffs simply assert that a genuine question of material fact exists and then cite cases holding that the existence of a joint venture, civil conspiracy, or agency is a question for the trier of fact.  In order for there to be a question of fact, there must be some evidence on the record that supports the non-movant's claims at the summary judgment phase.  Indeed, the cases relied upon by plaintiffs underscore plaintiffs' failure to provide any evidence of the existence of a genuine issue of material fact sufficient to avoid summary judgment.

In a similar predatory lending action, the plaintiffs in <u>Herrod v. First Republic Mortg. Corp., Inc.</u> alleged joint venture, conspiracy, and agency.  635 S.E.2d 373, 378 (W. Va. 2005).  Noting that the evidence on the record with regard to these claims was "inferential at best," the West Virginia Supreme Court of Appeals found that the report of plaintiffs' expert,

setting forth various theories as to how the loans were approved and the involvement of other parties in the process, was sufficient evidence for the claims to survive summary judgment. Id. at 383. The expert report provided the court with relevant dates and actions taken by the parties. Id. Concluding that the expert report appeared "to be the sole evidence of an arrangement between [the defendants] with regard to loan approval," the court concluded "that it should be up to a jury to determine whether there is sufficient evidence of a joint venture, agency, or conspiracy between these parties." Id. at 384.

Unlike the plaintiffs in Herrod, the Croyes are resting entirely on their allegations of the defendants' interactions. The court is unable to find even inferential supporting evidence in the record. While referencing the existence of documents which assertedly would create a question of fact precluding summary judgment in favor of the defendants, plaintiffs have failed to provide the court with the documents or an expert report detailing the information within the documents.

In support of their claim for joint venture, plaintiff claims that "each of the acts of the Defendants were done in furtherance of a joint venture in which each of the acts of the Defendants were pursued with a joint purpose, and each of the

26

acts of one is the act of the others." (Third Am. Compl. ¶ 24). GreenPoint contends that joint venture is not a cognizable claim in West Virginia and moves to dismiss, and alternatively for summary judgment, on Count V.

Relying on the holding of the West Virginia Supreme Court of Appeals in Dunn v. Rockwell relating to civil conspiracy, GreenPoint contends that joint venture is not a cognizable cause of action that, based on similar reasoning, can survive its motion to dismiss.[7] 689 S.E.2d 255 (W. Va. 2009). In Dunn, the court acknowledged that civil conspiracy "is not a per se, stand-alone cause of action; it is instead a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)." Id. Expanding upon the court's rationale, GreenPoint suggests that, similarly, joint venture is not a per se, stand-alone cause of action, and, thus, Count V must be dismissed.

---

[7] In a memorandum opinion and order entered June 2, 2010, the court addressed this argument as made by the defendant in Holmes v. Runyan, Civ. Action No. 09-679. The court's analysis here has largely been taken from its holding in that opinion.

27

The court is not persuaded by the analogy GreenPoint draws from Dunn.  The language in Dunn does not suggest that civil conspiracy is not a permissible cause of action generally. It simply states that it is not a claim that can stand alone without claims for the underlying torts.  Here, plaintiffs have alleged joint venture in addition to those claims for which it seeks to impose joint venture liability.  Significantly, Dunn did not result in the dismissal of the civil conspiracy claim for failure to state a cognizable cause of action.  Rather, the court assigned the applicable statute of limitations for the underlying tort claims to the civil conspiracy claim in order to determine whether it was time barred.  Moreover, plaintiffs in several West Virginia cases have asserted joint venture claims wherein the concept of joint venture has been recognized.  See generally, Herrod v. First Republic Mortgage Corp., Inc., 625 S.E.2d 373 (W. Va. 2005); Armor v. Lantz, 535 S.E.2d 737 (W. Va. 2000); Price v. Halstead, 355 S.E.2d 380 (W. Va. 1987); Pownall v. Cearfoss, 40 S.E.2d 886, 893-94 (W. Va. 1946); see also Short v. Wells Fargo Bank Minn., N.A., 401 F. Supp. 2d 549 (S.D. W. Va. 2005).

Under West Virginia law, joint venture "'is an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their

property, money, effects, skill and knowledge.'" Armor v. Lantz, 535 S.E.2d 737, 742 (W. Va. 2000) (quoting Price v. Halstead, 355 S.E.2d 380, 384 (W. Va. 1987)).  "[A] joint venture arises out of a contractual relationship between the parties. The contract may be oral or written, express or implied." Price, 355 S.E.2d at 384; accord Sipple v. Starr, 520 S.E.2d 884, 892 (W. Va. 1999). "[M]embers of a joint venture are . . . jointly and severally liable for all obligations pertaining to the joint venture, and the actions of the joint venture bind the individual co-venturers." Armor, 207 W. Va. at 677, 535 S.E.2d. at 742.

While the West Virginia Supreme Court of Appeals has "never formulated any broad analytical test by which to determine the existence of a joint venture," it has identified the "existence of certain 'distinguishing elements or features' essential to the creation of a joint venture." Armor, 535 S.E.2d at 743.

> 'As between the parties, a contract, written or verbal, is essential to create the relation of joint adventurers.... To constitute a joint adventure the parties must combine their property, money, efforts, skill, or knowledge, in some common undertaking of a special or particular nature, but the contributions of the respective parties need not be equal or of the same character. There must, however, be some contribution by each party of something promotive of the enterprise.... An agreement, express or implied, for the sharing of profits is generally considered essential to the creation of a joint adventure, and it has been held

> that, at common law, in order to constitute a joint
> adventure, there must be an agreement to share in both
> the profits and the losses. It has also been held,
> however, that the sharing of losses is not essential,
> or at least that there need not be a specific agreement
> to share the losses, and that, if the nature of the
> undertaking is such that no losses, other than those of
> time and labor in carrying out the enterprise, are
> likely to occur, an agreement to divide the profits may
> suffice to make it a joint adventure, even in the
> absence of a provision to share the losses.'

Armor, 535 S.E.2d at 743 (quoting Pownall v. Cearfoss, 40 S.E.2d

886, 893-94 (W. Va. 1946)(citations omitted)).

Another essential ingredient to an allegation of joint

venture is control of the joint venture by the participants.  Id.

at 745.  The decision in Armor turned on a lack of evidence in

the record of management and control among all of the alleged

joint venturers.  Id.  Emphasizing the significance of this

element, the court cited approvingly the following seven cases

requiring joint venturers to have equal or some degree of

control.  Id. (citing Bank of California v. Connolly, 36,

Cal.App.3d 350, 364 (Ca. 1973); Barton v. Evanston Hosp., 513

N.E.2d 65, 67 (Ill. 1987); Slaughter v. Slaughter, 379 S.E.2d 98,

101 (N.C. 1989); McSorley v. Hauck, 883 S.W.2d 562, 566 (Mo.App.

1994); Brown v. Jones, 503 N.W.2d 735, 738 (Mich. 1993); Hill v.

Zimmerer, 839 P.2d 977, 981 (Wyo. 1992); Ackerman v. Landes, 493

N.Y.S.2d 59, 60 (N.Y. 1985)).

As evidence of the existing joint venture among all the defendants, plaintiffs rely upon three written agreements that allegedly exist among the defendants: two Pooling and Servicing Agreements and the Subservicing Agreement.  However, plaintiffs have not attached these documents as exhibits or cited to language from the documents within their response brief.  The court has no indication as to when the documents were executed or whether all of the defendants executed each of the documents.  Without even a description by the plaintiffs of the nature of these documents, the court has no evidence from which it can deduce that the elements of a joint venture can be established at trial.  Additionally, it is observed that plaintiffs have neither alleged nor offered evidence of the sharing of profits or of the exercise of a means of joint control as set forth in <u>Armor</u>.

Furthermore, regarding Countrywide's alleged participation in the joint venture, Countrywide contends in its reply brief that it should avoid joint venture liability inasmuch as it undertook servicing on the loan on December 1, 2008, pursuant to an Amended and Restated Subservicing Agreement dated October 24, 2008, some four years after the origination of plaintiffs' mortgage loans.  (Countrywide Reply 3).  Plaintiffs acknowledge in the complaint that Countrywide has "recently been

assigned the servicing rights" of the plaintiffs mortgage loan.
(Third Am. Compl. ¶ 3(b)).   Thus, it appears from the parties'
allegations that Countrywide had not been assigned the servicing
rights on plaintiffs' loan at the time of origination.
So it is that any joint venture that may currently exist between
Countrywide and the other defendants was not in existence until
long after the origination of the mortgage loans.   Accordingly,
plaintiffs cannot impose liability upon Countrywide through joint
venture for the allegedly fraudulent acts of GreenPoint contained
in Count II.

Consequently, the court grants the defendants' motions
for summary judgment with regard to plaintiffs' joint venture
claim in Count V.

With regard to the civil conspiracy claim, plaintiffs
only pertinent allegation states that "the appraiser conspired to
commit the unlawful acts, or lawful acts by unlawful means,
hereinafter alleged, and each is responsible for all acts alleged
herein."   (Third Am. Compl. ¶ 26).   West Virginia law defines
civil conspiracy as:

> a combination of two or more persons by concerted
> action to accomplish an unlawful purpose or to
> accomplish some purpose, not in itself unlawful, by
> unlawful means.   The cause of action is not created by

the conspiracy but by the wrongful acts done by the
defendants to the injury of the plaintiff.

Dunn v. Rockwell, 689 S.E.2d 255, 268 (W. Va. 2009)(quoting Dixon
v. Am. Indus. Leasing Co., 253 S.E.2d 150, 152 (W. Va. 1979)).
Plaintiff's sole allegation of conspiracy relates to the actions
taken by the appraiser, Ms. Midkiff.  However, Ms. Midkiff is not
a party to this action and, as discussed above, plaintiff has not
made factual allegations or provided any evidence suggesting the
defendants were in contact with Ms. Midkiff or played any part in
her calculation of the value of plaintiffs' property.
Accordingly, the court grants the defendants' motions for summary
judgment as to plaintiffs' civil conspiracy claim in Count V.

     With respect to agency, plaintiffs allege that "the
acts of the other Defendants were done as agent for the Defendant
lender."  (Third Am. Compl. ¶ 27).  Plaintiffs further allege
that "[e]ach of the Defendants' acts were conducted as part of
the principal-agency relationship between the Defendants."
(Id. at ¶ 27).  The burden of proving agency rests upon the party
alleging the agency's existence.  Bluefield Supply Co. v.
Frankel's Appliance, Inc., 142 S.E.2d 898, 905 (W. Va. 1969).
Once again, there is no evidence in the record that such a
relationship exists among the defendants.  Plaintiffs must do
more than merely allege the existence of an agency relationship

in order to survive summary judgment.  Accordingly, the court grants the defendants' motions for summary judgment as to plaintiffs' agency claim in Count V.

V.

Based on the foregoing, it is ORDERED that GreenPoint's motion for summary judgment as to Counts I and III be, and hereby is, granted, and that its motion as to Count II be, and hereby is, denied.  It is further ORDERED that Countrywide's motion for summary judgment as to plaintiff William Croye's claims within Count IV be, and hereby is, denied.  It is further ORDERED that the motions of GreenPoint and Countrywide for summary judgment as to Count V be, and hereby are, granted.  It is further ORDERED that GreenPoint's motion to dismiss Count V be, and hereby is, denied as moot.

Accordingly, it is hereby further ORDERED that Counts I and III be, and they hereby are, dismissed.

34

        The Clerk is directed to forward copies of this written
opinion and order to all counsel of record and any unrepresented
parties.

                        DATED: August 11, 2010


                        _____
                        John T. Copenhaver, Jr.
                        United States District Judge